IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF INDIANA

WESLEY I. PURKEY

&

KENNETH E. BARRETT

&

LEZMOND C. MITCHELL,

         Plaintiffs,

Vs.                        CASE NO. _____

HERRE WATTS, Administrator/
National Inmate Appeals/Washinton, D.C.

&

MICHEAL K. NALLEY, Regional Director/
Bureau of Prisons/Kansas City, KS Office

&

R. V. VEACH, Warden/
United States Penitentiary/Terre Haute, IN

&

RANDY WHITE, Unit Manager/
Special Confinement Unit
United States Penitentiary/Terre Haute, IN

&

BRUCE RYHERD, Case Worker/
Special Confinement Unit
United States Penitentiary/Terre Haute, IN

&

DIANA QUINONES, Superintendent Education/
United States Penitentiary/Terre Haute, IN

1.

&

EDDY COMBS, Library Technician/
United States Penitentiary/Terre Haute, IN

&

DANIEL O'DEAN, Supervising Chaplain/
United States Penitentiary/Terre Haute, IN

&

T. B. SMITH, Facility Captain/
United States Penitentiary/Terre Haute, IN

&

W. COPE, Security Personnel/
Special Confinement Unit
United States Penitentiary/Terre Haute, IN

&

(First Name Unknown) Hemmrich , Security Personnel/
Special Confinement Unit
United States Penitentiary/Terre Haute, IN

&

(First Name Unknown) MILLINGTON, Security Personnel/
Special confinement Unit
United States Penitentiary

&

JOHN DOE, Security Personnel/
Special Confinement Unit
United States Penitentiary/Terre Haute, IN

Defendants.

**J U R Y   T R I A L   D E M A N D**

---

**C I V I L   R I G H T S   C O M P L A I N T**

**Preliminary   Statement**

**This is a Civil Rights Complaint** being filed by Wesley I. Purkey ("Purkey"),

2.

Kenneth E. Barrett ("Barrett") and Lezmond C. Mitchell ("Mitchell") who are all appearing in propria persona in this action. The plaintiffs' are all death row prisoners and are being housed in the Special Confinment Unit ("SCU") at the United States Penitentiary, Terre Haute, Indiana. They bring this action against all the defendants, named and unnamed pursuant to 28 U.S.C. § 1331 to redress and remedy the deprivations committed against them by the defendants who were acting under color of federal authority when they deprived the plaintiffs' of their rights, privileges, and immunites secured to them under the First, Fifth, Sixth and Eighth Amendments to the Consitution of the United States. The plaintiffs' seek both declaratory judgment, and money damages to redress and remedy those constitutional proscriptions which include but are not limited to: 1) being denied access to the courts' through a total meat ax abridgment of state law materials; 2) being denied religious worship services based on the pro capital punishment dogma of the Suprevising Chaplain; 3) being denied access to reading materials and other forms of information solely because of the plaintiffs' classification status; 4) being subject to a myriad of retaliatory actions including retaliatory disciplinary action on several different occasions, being subject to malicious shakedowns of both cells' and law library lockers, as well as having personal property illegally and unauthorized confiscated, and being subject to different implied threats of their meals being tainted for filing grievances and seeking redress of ligitimate issues through administrative processes, as well as for making complaints to different prison officials through correspondence and/or through person contact; 5) being subject to incessant and torturous noise which the defendants have and continue to show a deliberate indifference to; and 6) being subject to arbitrary and selective enforcement of policies and regulations where all the plaintiff's

3.

have and continue to suffer sanctions of punitive nature for their alleged non/compliance with sub rosa policies created and geared toward death row prisoners. Further' the plaintiffs seek injunctive relief from the Court anent the irreparable harm being suffered from the continuing constitutional violations permeating them through the defendants contumacious disregard to the same. Finally' the plaintiffs' seek an. award of dages against the defendants for all incurred cost of prosecuting this action, as well as for reasonable attorney fees.

## Jurisdiction   Statement

1.    This action is brought, and this Court has jurisdiction over this action under **Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation,** 403 U.S. 388 (1971), and pursuant to 28 U.S.C. § 1331.

2.    This Court is authorized to render declaratory relief pursuant to 28 U.S.C. §§ 2201 & 2202, and Rule 57 of the Federal Rules of Civil Procedures. Further' the Court is authorized pursuant to 28 U.S.C. § 2283 to render and provide injunctive relief.

3.    Certain designated Counts of this action the amounts in controversy of which is greater than $75,000, are brought relying upon this Court's diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

5.    All of the actions, omissions and events complained of herein took place with *in* the venue of this Court at the United States Penitentiary, Terre Haute, Indiana.

## Identification  Of  The  Parties

1.    All of the Plaintiffs' Wesley I. Purkey, Kenneth E. Barrett and Lezmond C. Mitchell are confined at the United States Penitentiary/Terre Haute, Indiana. Their mailing address is: United States Penitentiary, P.O. Box 12015, Terre Haute, Indiana 47801.

4.

**Defendant Parties**

2.    Defendant Herrel Watts is, the Administrator, National Inmate Appeals, Washington, D.C.. Hereinafter Defendant Watts, can be issued summons at: Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, D.C. 20534.

3.    Defendant Micheal K. Nalley is, the Regional Director, Bureau of Prisons, Kansas City, Kansas. Hereinafter Defendant Nalley, can be issued summons at: Gateway Complex Tower II, 8th Floor, 4th & State Avenue, Kansas City, Kansas 66101.

4.    Defendant R. V. Veach is, the Warden at the United States Penitentiary/Terre Haute, Indiana. Hereinafter Defendant Veach, can be issued summons at: United States Penitentiary, 4700 Bureau Road, Terre Haute, Indiana 47801.

5.    Defendant T. B. Smith is, the Facility Captain for the United States Penitentiary/Terre Haute, Indiana. Hereinafter Defendant Smith, can be issued summons at: United States Penitentiary, 4700 Bureau Road, Terre Haute, Indiana 47801.

6.    Defendant Randy White is, the Unit Manager for the Special Confinement Unit at the United States Penitentiary/Terre Haute, Indiana. Hereinafter Defendant White, can be issued summons at: United States Penitentiary, 4700 Bureau Road, Terre Haute, Indiana 47801.

7.    Defendant Bruce Ryherd is, the Case Worker for the Special Confinement Unit at the United States Penitentiary/Terre Haute, Indiana. Herein after Defendant Ryherd can be issued summons at: United States Penitentiary, 4700 Bureau Road, Terre Haute, Indiana 47801.

8.    Defendant Diana Quinones is, the Superintendent of Education at the United States Penitentiary/Terre Haute, Indiana. Hereinafter Defendant Quinones

5.

defendant will take place under Count Four of the Complaint.  For all purposes herein this defendant was so positioned in the Special Confinement Unit.  Hereinafter Defendant John Does can be issued summons at: United States Penitentiary, 4700 Bureau Road, Terre Haute, Indiana 47801.

15.    All of the defendants named or otherwise are being sued in their individual capacities and were acting in such capacity under color of federal authority at all times during the actions, events and omissions complainted of herein.

<u>COUNT  ONE</u>

### <u>DENIAL OF ACCESS TO THE COURTS COMMON TO PURKEY AND BARRETT</u>

Defendants Watts, Nalley, Veach, Quinones and Combs have and continue to deny Purkey and Barrett access to the courts' in violation the First, Fifth and Sixth Amendments to the Constitution of the United States.

**Facts Germane To Purkey**

1.    After being transferred to the United States Penitentiary/Terre Haute in February 2004 Purkey sedulously sought access to Kansas Legal Materials anent two different, but consolidated pending civil litigations in the United States District court for the Eastern District of Kansas.  Further' Purkey sought access to Kansas Legal Materials regarding habeas proceedings anent a Kansas conviction which the government used as a statutory aggravator in his capital proceedings. The defendants claim under applicable BOP authority, i.e. Program Statement 1315.07, Legal Activities, Inmates they they are not required under law to provide Purkey with access to Kansas legal materials. (A copy of that applicable Program States is hereto attached for the convenience of the court).  In redress of this total denial of access to Kansas legal materials Purkey sought resort to applicable administrative remedies which he availed himself of through the

7.

multi stages as promulgated under the governing administrative policy.  See Appendix (A).  The warden clarified through his response that he was not required to provide Purkey access to Kansas legal materials, and more specifically that, "institution staff are not required to provide an inmate with publications concerning specific state civil procedures." Id/Warden's Response.  He as well claims that staff tried to provide Purkey with excerpted pages from the Kansas Laws of Civil Procedures, but this simply is a misrepresenation.  The pages from the Kansas Rules of Civil Procedures the warden refers to were totally inapposite to 'Summary Judgment Pleading' which Purkey was in dire need of. Defendant Watts merely adopts the warden's response and echoes the misrepresentations by the warden and other applicable USP/Terre Haute personnel.

2.    The defendants claim, inter alia, that, Purkey must take affirmative action if he wants to secure access with Kansas legal materials.  See Appendix (B).  Because of the "up against a rock and a hard spot" Purkey found himself trying to defend  against summary judgment proceedings without access to so much as the local rules of the court he went the extra mile to attain the desperately needed Kansas Rules of Civil Procedures, both State and Federal. The Indiana School of Law agreed to help Purkey obtain these State Law materials, and mailed them in to him.  Without notice given when the law books arrived addressed to Purkey defendant Quinones confiscated the books being in full awareness of the reason the Indiana School of Law had so benevolently mailed them in to Purkey.  In redress of this unauthorized and illegal confiscation Purkey resorted to the administrative processes fully availing himself of all multi levels of the same.  See Appendix (C).  Citing to an inapposite policy the defendants claim that these law books fell under the same classification of that of 'religious materials' being donated, clearly a facade to addle the true

8.

unauthorized and illegal confiscation of the law books. The defendants all claim that all Purkey had to do was to request access to these confiscated Kansas Legal materials through the applicable policy. But' of course none of the defendants in their responses to Purkey's administrative papers identify that policy which set forth written promulgation for him to make such request for access to either law books or otherwise through the main compound facilities. This over/sight might be because no such policy exist, and in fact contrary to the implication of the defendants echoing responses Purkey assiduously tried to gain access to the law books even after defendant Quinones confiscated them, and she adamantly refused.

**Because Of The Denial Of These Legal Materials The Two Consolidated Cases Pending In The United States Court For The Eastern District Of Kansas Were Dismissed**

3.   The first of the two consolidated cases that were dismissed was originally filed in November 1999 and was dismissed sua sponte for failure to state a claim which relief could be granted on, i.e. Purkey v. Green, 99-CV-3356 (D.Kan.). On appeal, Case No. 00-3218 the Court of Appeals for the Tenth Circuit affirmed and reversed in part, August 17th, 2001. A second case filed while the first Purkey v. Green, was pending appeal was consolidated with that case upon remand, i.e. Case No. 01-3126-JAR (D.Kan). These cases have a protracted history and survived different dispositive challenges and were set for trial when the defendants filed a rather health Motion for Summary Judgment. After requesting and receiving different continuance to file his motion in opposition, Purkey was forced to file such without the aide of access to the local rules of the Court, i.e. Kansas Rules of Civil Procedures which he had so sedulously been trying to gain access to from the defendants to no avail. Because of his failure to adhere with the local rules of the court in filing his motion in opposition,

9.

the Court granted the defendants Motion For Summary Judgment against Purkey.

4.    Thereafter Purkey filed a Rule 59(e) Motion for Reconsideration, clarifying to the court that he had been religiously trying to gain access to the local rules of the court, but had been definitively denied the same by the defendants.  In fact Purkey went so far as to attach a copy of the admini- strative remedy which he utilized in seeking redress for being denied access to applicable state law.  After the motion for reconsideration was denied Purkey timely filed an appeal to the Court of Appeals for the Tenth Circuit, Case Number 05-3126/D.C. No. 01-CV-3134-JAR(D.Kan).  The Tenth Circuit affirmed, February 2006.  Thereafter Purkey Petition for A Writ of Certiorari to the United States Supreme Court, Case No. 05A873, June 19th, 2006.  Reviewed was denied. The consolidated cases were meritorious.

5.    In preparation of filing this action Purkey has made diligent request to be provided access to the local rules of the court, i.e. Indiana Rules of Civil Procedures.  Defendants Quinones and Combs have both advised Purkey that that are not required to provide him access with such legal materials.  See Appendix (D).  In fact defendant Combs has went so far as to tell Purkey that, "[I]f you think that you can get the courts' to find that we are denying you access to the courts' anent denying you access to state law materials then, 'Go for It'," he proclaimed.

6.    The defendants claim that one reason that they do not provide prisoners with access to state legal materials is based on limited space issues.  See Appendix (E).  But' this claims seems tenuous in light of the fact that USP has converted from a hard bound law library to utilizing LEXIS/NEXIS Electronic Computerized Research Systems which really is not subject to such a claimed space limitations.  But' whether a space limitation does exist or not really

10.

is not germane to the unauthorized and illegal confiscation of the Kansas Law books mailed into Purkey by the very source the defendants mandated that Purkey utilize in gaining access to them.

**Purkey's Pray For Relief**

7.    Because of the irreparable damages rendered and the emotional and mental anguish suffered Purkey because of the defendants unyeilding obstinates to afford him access with Kanas Legal materials Purkey request that the Court grant him compensatory damages in the amont of $150,000 against the named defendants jointly and severly.

8.    Further' Purkey request that the Court grant him an award of punitive damage in the amount of $25,000 for thei outrageous conduct of confiscating the law books mailed into him from the very source they mandated that he receive the Kansas Law Books from.

**Facts Germane to Barrett**

9.    After his transfer to the United States Penitentiary/Terre Haute in March 2006 Barrett immediately sought access Oklahoma State legal materials anent prosecuting both civil litigation pending in the United States District Court for the Eastern District of Oklahoma, as wellas for collateral attacks on criminal convictions from the State Of Oklahoma.    Shortly thereafter Barrett was advised by defendant Quinones that USP Terre Haute was not mandated to afford him access with legal materials for the State Of Oklahoma, especially for pro-secuting civil litigation.

10.    After pleadings were rejected by the District Court for Barrett's failure to comply with the local rules in filing the same in **Barrett v. Philpot,** Case No. 05-329-P (E.D.Okla.2005) and other civil litigation was dismissed for Barrett's failure to properly plead to applicable law he sought redress through

11.

the administrative processes availing himself of applicable multi levels of the same.  See Appendix (F).  The defendant claim both that they are not required to afford Barrett with access to Oklahoma legal materials and mandates that he take affirmative action to gain access.  Id.  Even though Barrett told the defendants that he had no obligation under law--to take affirmative action to gain access with state legal materials that they should provide him, he still went that extra mile in effort to obtain such through the source provided, to no avail.

11.    In total futility Barrett requested that he either be provided with either necessary state legal materials to defend and present the litigation he has pending in the State of Oklahoma and/or to be provided with someone who is trained in law and has access with these state law materials.  Assistant Warden Role during administrative rounds in the Special Security Unit on February 28th, 2007 that USP/Terre Haute has absolutely no obligation either under law or policy to provide Barrett with either Oklahoma State legal materials and/or someone trained in law with access to the same.  In fact she went so far to tell him that, "[I]f you do not like that - thenyou should of thought about that before you did what you did to come here."

12.    With respect in preparing and drafting this action for filing with the court Barrett has requested access with the Indiana Rules of Civil Procedures from several of the defendants including defendants Combs and Quinones.  Both of the defendants have perspicuously told Barrett that they do not have to pro- vide him with access to these civil rules.  When Barrett asked if he could gain access to those through perhaps the compound law library, both of the defendants advised him that the main compound law library does not maintain a copy of the Indiana Rules of Civil Procedures.  When Barrett asked Defendant Quinones how

12.

he was to comply with the local rules of the court when filing litigation in the United States District Court for the Southern District of Indiana she told him, "just do the best you can and see what happens."

13. Barrett has several other legal matters pending and/or comtemplating legal redress in the State of Oklahoma which he is being denied necessary state law materials to litigate. In fact he has a pending case out of Sequoyah County Oklahoma, Case No. CF-1999-00493 which he wants to file collateral proceedings in but without access to state law materials that would be a totally futile effort. As well as criminal charges pending which have not been resolved and/or prosecuted which Barrett wishes to bring resolution to. Further' because of the defendants denying him access to state legal materials a case out of the Eastern District of Oklahoma was sua sponte dismissed for his failure to adhere with the local rules of the court.

**Barrett's Pray For Relief**

14. Because of the irreparable harm rendered by the defendants denying Barrett with access to Oklahoma State Law anent litigation dismissed and litigation he is being denied pursuing Barrett request that the Court grant him compensatory damages in the amount of $50,000 against the defendants jointly and severly.

15. Further' Barrett request that the Court grant him an award of punitive damages in the amount of $10,000 for their unyeilding obstinate in both denying him with access to Oklahoma Legal materials and/or someone trained in law who has access to the same.

**COUNT TWO**

**DENIAL OF READING MATERIALS AND THE RIGHT TO RECEIVE INFORMATION**

Defendants Watts, Nalley, Veach, White, Ryherd, Quinones and Combs have

13.

and continue to deny Purkey and other similarly situated Phase I prisoners access to reading materials in the Special Confinement Unit, through the Facility Library and/or IntraLibrary Loan System which is applicable to general population. Thereby running afoul with fundamental tenets under the First Amendment's 'Right To Read and Receive Information' principles, as well as contravening the Fourth Amendment's 'Equal Protection Clause' because the defendants are treating those similarly situated differently without cause.

16.   Death Row Prisoners are classified and house in the Special Confinement Unit under one of three different phases. Prisoners arriving on death row are initially classified to Phase I and must remain there their initial year, and thereafter become eligible for advancement to Phase II depending on a discretionary factors during classification review. Through classified to Phase III are those prisoners with scheluded execution dates. Purkey has remained on phase I his entire three and more years on the SCU, where numerous other prisoners have as well being denied advancement to phase II. The different phases are maintained on different ranges supposedly to deter contact between the different phases of prisoners - surely not for security reasons because all death row prisoners are housed in the same unit and are subject to the same security structures. The significant difference between the phases are the privileges allowed and/or denied.

17.   Phase II prisoners have access to two Leisure Areas on the Unit which provides t.v.'s, a mircowave in each, games and a pretty wide variety of reading materials, which includes Newspapapers, Magazines, Religious and Educational Materials. Phase II prisoners have six recreation periods a week, three of those recreation periods are for two (2) hours each and then they as well have three evening periods of one (1) or an hour and a half three times a week. Dur-

14.

ing these recreation periods they have access to both the leisure rooms and the reading materials, games, mircowave and t.v.s if they chose. They as well have a choice to use either inside or outside recreational areas which limited, both assorted pieces of workout equitment.

18.    In contrast, Phase I prisoners are allowed three (3) recreational or exercise periods a week for two (2) hours a period. Phase I inmates are not afforded access to the Leisure Rooms even though those rooms remain unoccupied during those periods. Phase I prisoners have a choice of either utilizing inside exercise rooms with limited exercise equitment or outside recreational cages which afford basketball goals and fresh air. Phase I prisoners are allowed three ten minute periods a week to a mircowave on the range which they live. During these periods they are generally, I say generally because depending on what staff and the mentality of that staff determines whether the phase I prisoner is allowed the use their ten minutes for reviewing the modicum of books displayed on a cart next to the mircowave. The range Purkey reside, Lower C, the book cart contains thirty books which he counted last night when using the mircowave, March 28th, 2007. At times Purkey has been told that either he uses the mircowave or cell in, because the book cart is not there solely to be used during mircowave use as Officer Estell has reiterated on a number of occasions. In fact depending on which offices' are working the unit the book cart has actually been taken from the range for weeks at a time and phase I prisoners have had absolutely no reading materials available to them during those periods. Defendants Ryherd and White have both emphasized and reiterated on a number of different occasions that they do not have any control over SCU personnel and Purkey should taken his complaints anent these issues to either the warden or the facility captain during administrative rounds if they actually make administra-

15.

tive rounds that is.  Phase I prisoners do not have access to any other reading materials through either the leisure areas and/or the facility labrary.  Purkey has requested on numerous occasions to be allowed to request reading materials through both the facility library and through intralibrary loan but defendant Quinones has unrelentingly told him that those sources are not available to death row inmates.  When Purkey requested what authority she was denying him access to those sources was she refused to or could not provide him with such promulgation.

19.  At one time Phase I prisoners' book carts were being stocked with a limited number of newspaper and magazines.  These newspapers and magazines were discarded newspapers and magazines from Phase II prisoners, generally anti-quated and mutilated beyond use.  See Appendix (G).  The defendants responses to Purkey's redress sought through administrative channels anent being denied access to reading materials pretty much mirror one another.  Defendant watts's response exemplified the subterfuge of the resolution to Purkey's claims. He claims without identifying, let alone supporting such that, "[T]he section of reading materials is made such that a balance between reference materials and recreational reading will be maintained.  Our information, contrary to your (Purkey) claim, indicates materials for non-English speaking inmates are purchased in proportion to the percentage of the population they represent." Of course a significant impetus of defendant Watts's response was the result of Purkey's claim that defendants Combs and Quinones stocked C Lower Range with newspapers and magazines in both spanish and chinese in reprisal for Purkey causing them problems regarding being denied reading materials.  No one on Lower C Range or the unit for that matter reads spanish or chinese.  Mr. Watts response is pretty much incoherent certainly not a legitimate answer to Purkey's fact

specific claims.  This evasive, addle and nebulous is evident of the ostracism the defendants played to Purkey's claims.  Because of the continued denial to afford Purkey with adequate access to reading materials he persisted to request access through request to reading materials either through the compound library and/or intralibrary loan.  See Appendix (H).  The the defendants through the warden's response claimed, inter alia, that Purkey had available to him basically what is available to phase II prisoners.  Id.  Purkey did not decisively dispute this fact, because as clarified above he has never had access to phase II prisoners leisure rooms where their books, magazines and newspapers are mantained, but Purkey has vividly seen these materials through the windows of these areas during escorting to and from recreation.  The warden's contentions that phase I and phase II prisoners have the same availability to books, magazines and newspapers is without substance and is totally tenuous at best.  In over three years Purkey has had access to the most extreme measure of reading materials, not a token of the reading materials available to phase II prisoners, and because Purkey is considered a trouble maker by the defendants for filing grievance on his own behalf and aiding other as well in those endeavors he will never truly be considered for advancement to phase II status.

20.   Defendant White has perspicuously clarified the impetus behind severely limiting Phase I prisoners access to reading material.  "If a prisoner wants access to the Leisure rooms and reading materials available their then they need to work to achieve those privileges," Mr. White told Purkey.  So in other words Purkey asked defendant White that the sole reasoning behind denying pahse I prisoners access to the reading materials available to phase II prisoners through the Leisure Rooms is based on your contentions of who deserves that access and who doesn't.  The answer was simply and candid, "Yes".

17.

"So' no security interest is involved denying phase I prisoner access to either the reading materials available through the Leisure Rooms or the Leisure Rooms themselves," Purkey asked Mr. White. "If you want access to the reading materials made available to phase II prisoners and to the the Leisure areas themselves then you need to start changing your attitude and behavior here," defendant White told Purkey.

21.   On March 6th, 2007 Purkey requested through defendant Ryherd to be allowed to utilize one of his picture tickets purchased through the commissary for taking a picture of both sides of the book cart stationed on Lower C Range. That request was summarily denied without reason given - no security interest was involved, so defendant Ryherd simply did not want such pictures taken for intuitive reasons.  This same week after approximately ten or twevle books were added to the book cart someone took a picture of one side of the book cart.  The opposite side of the book cart is totally vacant of books or any other reading materials for that matter.

**Purkey's Pray For Relief**

22.   Because of the irreparable harm caused by the denial of reading material and the ongoing nature of such Purkey request that the Court grant him compensatory damages in the abount of $10,000 against the defendants jointly and severly.  Further' he request for injunctive relief in the fashion of an order by the Court enjoining the defendants from denying phase I prisoners access with the reading materials available to phase II prisoner if they cannot proffer any legitimate and/or security interest in that disparate treatment.

23.   Further' Purkey request that the Court grant him punitive damages to punish the defendants and deter them from further such contumacious constitutional proscribed conduct in the future in the amount of $5,000 against the defendants

18.

jointly and severly.

## COUNT  THREE

### DENIAL OF RELIGIOUS SERVICES COMMON TO PURKEY AND MITCHELL

Defendants Watts, Nalley, Veach and O'Dean have and continue to deny Purkey Religious Worship Services based on Chaplain O'Dean Pro Capital Punishment Dogma; and deniy Mitchell 'Sweet Lodge' access which is equated with Religious Worhsip Services.  These actions do not only violate the First Amendment's 'Free Exercise Clause', but as well per statutory provisions under the Religious Freedom Restoration Act (RFRA) 42 U.S.C. § 2000bb-1 and the Institutionized Persons Act of 2000; Codified at 42 U.S.C. § 2000cc.

**Facts Germane To Purkey/Denial Religious Worship Services**

24.    Through Febraury 2004 and June 2005 SCU prisoners all phases were allowed religious worship services which included Non/Denominational and Catholic Services.  Purkey is of the catholic faith.  Generally catholic and non/denominational services would alternate every othe week, and were generally held on saturday afternoon's.  During this period Chaplain Bonham was the Supervising Chaplain of Religious Services for the Facility. No problems ever arose during either of the religious services held in the SCU.

25.    The religious worship servicess were held in a multi/purpose area of the unit.  Prisoner were held in a number of different cages which were generally utilized for workerd during the week wrapping silver/ware for the main kitcken. These cages were small areas fenced in structures of about 5 x 6 feet.  Much smaller than actual cells prisoners dwell in, but sufficiently large enough for their purposes of short period use.  The priest or chaplain would perform the service in the common area of the multi/purpose room always without incident. At times special services were allowed as well beyond the general biweekly

service.  One particular special occasion comes to mind when the Archbishop held a special mass when a prisoners was facing imminent execution, i.e. David Hammer.

26.    After being transferred to the new facility around June 2005 religious worship services were to be held in the multi/purpose there as well.  During a tour of the unit before openning the Federal Resource Counselors, including Maragert O'Donnel were told that the multi/purpose was to be used as a general work area and for religious worship services.  The multi/purpose area of the new unit consist of more cages than at the previous unit, having twn (10) which are almost identical in size to those at the previous unit.  But religious worship services would not be held at the new unit in contrast with what the Federal Resource Counselors were told by applicable administrative officials.

27.    The multi/purpose area was still under finishing construction when death row prisoners were initially transferred from the old unit.  During this same period defendant O'Dean resumed a Supervisory capacity of the Religious Department, and told Purkey that we are not going to have religious worship services on this unit.  Being taken back as to why the abrupt change was taking place Purkey asked the defendant why?  Initially the defendant remained reticent, and was obviously agitated at Purkey's persistency to extrude an explanation from him.  "I really do not have to provide you with an explanation.  We are going to provide death row inmates with religious worship service via television," O'Dean told Purkey.  "That is hardly the same as interrelation religious worship services, and besides there is absolutely no reason why we cannot be provided worship services the same as we were nextdoor," Purkey told the defendant.  "We are not allowing religious worship services on this unit - besides the structure of the unit prohibits such," O'Dean told Purkey.

20.

28.    Later" Purkey stop the warden during administrative rounds and advised him of the conversation he had shared with defendant O'Dean anent worship services. Further' he clarified to his understanding that absolutely no security interest was at stake in considering this matter, because basically we have almost the exact same structure for providing services as we did nextdoor. The only thing different in that equation for determining whether or not to allow worship service is the O'Dean factor. The warden readily admitted that he did not know of any security interest at issue in the matter, although he has told O'Dean that the authority whether to allow or not is his.

29.    Defendants Watts, Nalley and Veach all contend basically now that Chaplain O'Dean basis his decision not to allow worship services on structural consideration of the unit. See Appendix (I). The defendants content that, "due to the 'unique nature' of the SCU prevents faciliating worship services." Id./ Regional Director Response. This contention is tenuous and quickly dispelled through the very fact that in O'Dean's absence a mass was held on the unit during Christmas 2005, and again during lent. No problems were experienced and the area the two masses were held in, i.e. the multi/purpose areas were very adequate and sufficient for the services held.

30.    Although Purkey identified through all of his administrative remedies utilized in redress of being denied religious worship services the reasons for such denial none of the defendants stepped up and addressed it. That is, "based on Chaplain O'Dean's Pro Capital Punishment Dogma he is denying the SCU prisoners religious worhsip services." To negate the enormity of the constitutional violation the defendants make tenuous efforts to debunk Purkey's claim. They contend that although he is being denied religious worship services that he still can pray in his cell, read religious materials, view religious

21.

worship services via his twevle inch black and white t.v. and go on to provide several other palliating methods that would serve the same level of worship given through actual religious worship services.

**Facts Germane To Mitchell's/Denial Religious Worship Service**

31.    The initial part of 2004/January shorly after his transfer to the SCU, Mitchell submitted a request anent access to 'Sweat Lodge' and concerning being allowd to practice his native American Beliefs and Sacred Rituals. Chaplain Bonham discussed these issues with Mitchell and suggested that he draft a proposal for accommodating his request, and that in turn he would present this material to applicable administrative officials for their review and determination.  Mitchell assiduously complied with Chaplian Bonham's suggestion.

32.    Chaplain Bonham sometime later brought Mitchell a response that held, inter alia, that, "[Y]our request . . . is denied for the following reasons: 1) the safety, security and orderly running of the SCU does not allow for a separate Sweat Lodge to be built and operated to the SCU; 2) your religious beliefs will be accommodated in the least restrictive means possible.  You are allowed the sacred pipe and allowed to smudge with sage in an outside recreation cage on a monthly basis."  See Appendix (J).

33.    Mitchell then sought redress for being denied religious worship services through the applicable administrative channels availing himself of all appellate processes therein.  The defendants through their responses all distort the safety and security interest involved in accommodating Mitchell's request for Sweat Lodge.  They content that such access would interfer with the orderly running of the institution, but these are merely generalized security interest nothing of true substance.  Further' they claim that maintaining a Sweat Lodge adjacent to the SCU would present security concerns, unidentified security concerns

22.

security concerns that is.  But those unidentified security concerns really are not germane to the issue at all, because Mitchell did not suggest that the Sweat Lodge be adjacent to the SCU, but within the SCU and adjacent to the recreational cages outside.  No security concern would be present in that structure, as their is ample area for the Sweat Lodge to be structured and maintained, which would accommodate Mitchell to practice his Native American Beliefs and Sacred Rituals.

**Purkey's and Mitchell's Pray For Relief**

34.   Because of the irreparable harm suffered by Purkey and Mitchell in being denied religious worship services for well over a three year period by the defendnat they request the Court to grant them compensatory damages in the amount of $10,000 against the defendants jointly and severly.  Further' they seek injunctive relief from the Court in the fashion of an Order enjoining the defendants from prohibiting them from religious worship services, and to be allowed the opportunity to practice their religious beliefs that does not present any issues of security to the defendants.

35.   Further' Purkey and Mitchell request that the Court award them punitive damages for the flagrant and ongoing violations of First Amendment guarantees in denying them religioius worship services in the amount of $10,000 against the defendants jointly and severly.

## COUNT   FOUR

### RETALIATORY ACTIONS TAKEN AGAINST PURKEY BY THE DEFENDANTS

Defendants Watts, Nalley, Veach, White, Ryherd, Cope, Heimrieh, Millinton and John Doe in violation of the First Amendment's 'Right To Petition Clause' subject Purkey to myraid of retaliatory actions for filing grievances on his own behalf, as well as on the behalf of numerous other death row prisoners,

23.

including retaliatory disciplinary action on several different occasions, malicious cell shakedowns, and the unauthorized taking of his property, as well as malicious shakedowns of his law library locker.  Further retaliatory acts having including forcing Purkey to defecate himself refusing to allow him to use the bathroom, and as well subjecting him to sanctions of punitive nature through intentional circumventing of applicable BOP Policies and Regulations.

### Retaliatory Disciplinary Action And Shakedowns By Defendant Cope

36.    After filing a grievance against Office Cope and his superior Office, Black for their continuing shakedowns of Purkey's cell, whereas they left it in total upheavalment on October 11th, 2005, as well as seeking redress through making complaints to Case Worker Ryherd through the Cop Out system defendant Cope issued Purkey a fabricated disciplinary report October 13th, 2005 for allegedly threatening another with bodily harm or any other offense.  See Appendix (K). This charge was made against Purkey by Cope who said that he had heard Purkey telling another inmate that Case Worker Ryherd needs his ass kicked, although Cope clarified that he did not witness Purkey saying this, but that he knew his voice and that based on that he knew it was Purkey who made the remark.  The fabrication of the disciplinary report is furtherly' evident by the orchestration of the disciplinary proceedings themselves.  Defendant Cope was telling another staff member that it has already been arranged that Purkey is going to the hole for the shot I gave him.  See Appendix (L)(Affidavit Gary Sampson).  This clair-voyance by defendant Cope came to past during Purkey's disciplinary hearing. "You are guilty Purkey, because the officer said you," the DHO told Purkey. "And, based on the Unit Disciplinary Committee/White and Ryherd, I am going to impose your disciplinary sanctions, otherwise I would of suspended them because this is your first disciplinary write up in over two years," he said.

24.

37.    During the time Purkey was in disciplinary segregation, as well as after he was released from serving his imposed disciplinary sentence Cope continued to shakedown both his cell and law library locker everytime he came out of his cell for law library use.  Several grievances were filed anent these malicious and retaliatory alleged shakedowns where each and everytime Cope would leave Purkey's cell and/or law library locker in total upheavalment. Making every conceivable effort possible to resolve these continuing malicious shakedowns Purkey asked Cope why do you continue to shake my cell and law library locker down, and leave everything in total disarray everytime I come out of the law library.  Through a mordant attitude the defendant clarified that, "I will continue to shake your cell down and law library locker down wherever I want, and do it however I want, so get use to it," Cope said.  See Appendix (M) (BP/8).  In redress of the actions and claims Cope conveyed to Purkey he filed a Cop Out to Case Worker Ryherd anent Cope's continuing shakedowns and the claims Cope made to Purkey that evening.  Purkey stuck the Cop Out in his cell door to be picked up and placed in Ryherd's box. After the Cop Out was picked up Cope came to Purkey's cell and told him, "you filing this shit is getting old.  I already gave you one shot and made it stick, and I can give you more."  See Appendix (M)(BP/8).  The shakedowns continued of both Purkey's cell and law library locker by Cope everytime he came out of his cell for law library, whereas Purkey was the only SCU prisoner to be subject to such shakedowns and cell upheavalments everytime they came out for law library use.

38.    Defendant Ryherd claims that these cell shakedowns were merely random, without any sinister motive attached.  Id. (BP/8 Response).  The fact of the matter was - was that Case Worker Ryherd was actually not only condoning these malicious acts by Cope against Purkey but mandating them as well.  See Appendix

25.

(N)(Affidavit/Purkey).  With clarity defendant Cope loudly proclaimed that Case Worker Ryherd had told him and other SCU staff to issue disciplinary reports for whatever reasons they could and that they would make them stick in redress for the grievances and problems certain Lower C Range inmates were causing.  Id. This pronouncement by defendant Cope was distinctly heard by every Lower C Range Inmate.  The following day Purkey confronted Ryherd with this proclamation made by defendant Cope and he said that - that was a lie and that he would have Cope personnally make that anouncement the following day.  No such anouncement was ever forth coming, and the next time Purkey was to ask Mr. Ryherd about the matter he became irritate and reticent, no longer claiming or disputing defendant Copes proclamation of retaliatory animus against certain Lower C Range Inmates.

### Retaliatory Actions Defendant Ryherd

39.    Through numerous manners, including the anouncement made by defendant Cope the retaliatory animus held by defendant Ryherd against Purkey ahs been the driving force behind a myraid of retaliatory actions Purkey has been subject by defendant Ryherd.  Ryherd has clarified this anamosity against Purkey to other death row prisoners as well, those prisoners who have sought Purkey out for aid with different egal endeavors including helping them draft and file admin- istrative remedies.  One such inmate is Bruce Webster who Purkey has aided with several different administrative filings, including anent execution protocol. Defendant Ryherd told Webster on one occasion that you really do not want this guy helping you with all of these grievances; he has his own agenda and is only anting to cause everyone here problems.  "If you mean, he is causing problems by helping me and others with issues of our confinement, then I suppose you are definitely right about that, and I am thankful that he is willing to be so generous with his time to do that," Webster told Ryherd.

26.

40.    A few months after Purkey arrived on death row he was assigned as the law clerk, without any complaints of his ability to function in that position, and/or to perform assigned duties.  He started receiving flak from both Ryherd and White shortly after he started helping other inmates seek redress through administrative channels for different issues of their confinement on the unit. At time they reduced his pay without cause and when he filed a grievance seeking redres for this allegedly retaliatory action he was fired from the law library clerk's position.  Thereafter Purkey sought redress through administrative remedies for this allegedly retaliatory firing, and shortly after filing that grievance defendant Ryherd placed Purkey in Inmate Financial Responsiiblity Payment Refusal status.  Because of this arbitrary placement numerous sanctions were imposed against Purkey.  When Purkey requested that Case Worker Ryherd provide him with the applicable regulation and promulgation he used in assessing Purkey's IFRP payment which he claimed Purkey had refused to comply with the defendant merely told him that - that assessment is solely mine to make and your's to comply with. Under the applicable BOP regulation governing IFRP Purkey was not required to make any payment for that previous six month period.  The policy and the promulgated criteria for making this determination will be more fully developed under Count Six of the Complaint.

41.    A year later after helping another draft and file a law suit, i.e. Inmate Ortiz defendant Ryherd again had Purkey placed in IFRP refusal status for not satisfying IFRP payment assessed by him.  This took place even though Purkey tried to avoid the irrevocable sanctions that he knew he would suffer once again if he refused to comply with the arbitrary assessment.  Defendant Ryherd went so far as refusing to that the funds from Purkey's trust fund account and then claimed that Purkey has again refused to pay the IFRP assessment pay-

27.

ment subjecting Purkey once again to the full spectrum of sanctions as before.

42.    On two different occasions Purkey was forced to defecate himself when Ryherd and his subordinates refused to allow Purkey to use the bathroom while in the law library, which does not have a bathroom in it.  See Appendix (O). When literally begging to be allowed to use the bathroom Purkey was told to "sit down and shut up."  Id.  Case Worker Ryherd was present when his subordinates who were playing cards at the officer's table and sharing a meal told Purkey after he requested to be allowed to use the bathroom to sit down and shut up, until they were done with their card game and meal.  Forty-five minuted later Purkey was allowed to return to his cell and clean himself.  See Appendix (O).

## Retaliatory Shakedown And Taking Of Purkey's Personal Property
## By Defendant Millington

43.    The night of November 24th, 2006 after being let out his cell for the typing room which is located on the same range Purkey lives on he heard a cell door opening on the range and thought that that was strange because there is generally almost no movement at all after count on phase I.  Going to the typing room door and looking out the window he could see that it was his cell that had been open and an office was inside it.  Fifteen or so minutes later defendant Millington came out of Purkey's cell and proceeded to leave the range.  Purkey stop the defendant and asked him what he had been doing in his cell.  "I'll shake your cell down anytime I want," he told Purkey.  When Purkey asked him what he had taken out of his cell the defendant blatantly lied to him telling him that he had not taken anything out of his cell.  "That is not true, I can plainly see you carrying the box I had set back for mailing some craft items out to my daughter.  What else did you take," Purkey asked him.  "I didn't take anything, I told you," the defendant Purkey.  When Purkey asked him his name,

28.

the defendant wanted to know why he wanted it.  "Because I am going to write you up for the malicious shakedown and unauthorized taking of whatever property you took out of my cell without a confiscation slip," Purkey told him.  The defendant refused to give Purkey his name, as did his superior, Officer Cope who was the officer in charge that night.  Returning to his cell sometime later Purkey found it in total upheavelment.  Sheets and blanket thrown on the floor, his legal materials and law books tossed everywhere throughout the cell. Items in his locker had been thrown around and the locker as well being left in disarray, with pictures of Purkey's family, daughter and grandkids discarded from his photo album and lying amoung the other items on the floor.  Further' Purkey found numerous personal items missing which he had purchased from the commissary and/or vendor anent craft items.  Most of these items were listed in administrative remedies Purkey sought redress for the retaliatory shakedown and unauthorized taking.  Id.

44.    Defendant Watts, Nalley, Veach, White and Ryherd all condone Millington's retaliatory shakedown and taking of Purkey's personal property which is evident through their mirrowed responses throughout the administrative processes.  See Appendix (P).

### Retaliatory Actions Defendant Heimrieh

45.    On the evening of March 13th, 2007 defendant Heimrieh came to my cell and told me that he was required to handcuff me going and returning from the typing room.  When I asked him why that was because no one is required to be handcuffed going to and from the typing room he told me it was per order of the warden and captain Smith.  I knew this was not true and that he was using this to harass me, especially since in the past weeks he had intentionally made every effort he could to provoke me and instigate.  In fact he had told me

29.

days prior to this particular incident Heimrieh had immediately started to harass Purkey when he came out to use the mircowave and to check out the book cart. Almost immediately after Purkey came out the defendant started howling at him to hell the hell up. When Purkey asked him why he was harassing him, that he had ten minutes to use the mircowave and check out the book cart, the defendant told him, "I'v read what you have written in those grievances and you just need to hurry the hell up."

46. After putting Purkey in handcuffs to escort him to the typing room on the 13th, almost immediately after Purkey stepped out of his cell and the defendant grabbed his bicep, he started pulling Purkey backwards and rising up on his arm as he pulled him back while escorting him. When Purkey protested the treatment the defendant just smiled at him and learning in closer to Purkey's face toward him, "you do as I say here, and you better learn it." Escorting Purkey back from the typing room the defendant again tighten down on Purkey's bicep, literally pulling him backwards and again raising up on his arm causing significant pain to both his arm, back and shoulders. When Purkey protested, again this malicious treatment the defendant got in Purkey's face and started mocking him telling him that, "you aren't such a tough guy now are you. You want to make trouble filing all of those grievances, trouble makers have problems here," and continued to mock and provoke Purkey the entire time from the typing room back to his cell. The camera on the range obviously would either prove of disprove these allegations asserted by Purkey, whereas Purkey requested the film reviewed the following day through a conversation he shared with Case Worker Ryherd concerning this incident. After explaining this matter to Mr. Ryherd and giving him grievances anent the abusive behavior the previous night, he requested the officer's name. Mr. Ryherd assured Purkey that he would

go check the log book right then and bring the names back of the officers working the previous night.  Mr. Ryherd never returned and/or provided the names of the officers on the response to the BP-8 either.  The spelling of the defendant's named might not be correct, as Purkey is going by mere pronunication, because no one will provide the first name, nor correct spelling of this defendant's name to him.  When Purkey can confirm the correct spelling of this defendant's name, both first and last he will notify the court and the defendants counsel through appropriate pleadings.  The acts of this defendant have been presented through all stages of the admisnistrative processes, with exception to those denied access to.

### Retaliatory Actions John Doe

47.    On March 19th, 2007 during the evening meal John Doe told Purkey when he picked up the trays from Purkey's cell door slot that, "you never know what might be in these trays."  That statement immediately brought Purkey up from the chair he was sitting in, and he asked that officer what he had said, even though Purkey had heard the comment perfectly.  John Doe just smiled at him and walked off pushing the food tray cart.  The following day Purkey advised Case Worker Ryherd of the threat made by John Doe, and stressed the obvious, that he was totally vulnerable to such a threat of having his food poisoned by some officer with a personal animus against him.  As he clarified to Ryherd that this was the same officer who not only denied him toilet paper while in the typing room which he included in a grievance pretaining to a different incident anent second shift's animus against him dealing with tying to get out of the typing room to use the bathroom.  As well in the past couple of months this officer has not heard his personal animus against Purkey.  Mr. Ryherd assured Purkey that he would go check the log book and bring him back

31.

the names of the officers working the previous night. Again this promise did not materialize. The following day' Purkey filed a grievance with Mr. Ryherd during his administrative rounds in the unit.

48. Because of this threat by John Doe anent tainting Purkey's food he did not eat an evening meal until March 29th. Purkey did retain the bread from the evening meals because he felt concealing poison in the bread would be extremely difficult. Because of this threat Purkey continues to be suspicious of his mealing being tampered with in one shape or form, and continued to suffer grave mental anguish because of such.

49. On March 29th, 2007 Purkey sent a Cop Out to Unit Manager White anent the status of the grievance filed almost ten days prior to that with Mr. Ryherd concerning John Doe and the threat made. In that Cop Out Purkey improperly identified the date he afforded the grievance to Mr. Ryherd but this should not of have and germane bearing on Mr. White's ability to locate and determine the status of the grievance. I sent the Cop Out to Mr. White requesting a copy of the same to document efforts to ascertain the status of this administrative remedy, because Mr. Ryherd is on vaction. The Cop Out was given to one of the second shift officer's who came to Purkey's cell at 1:30 p.m. asking him if he wanted to go to recreation. Purkey heard the officer give this Cop Out to OIC Daughtery, who in turn, Purkey heard say, "I can't read this shit, go a head and put it in White's box."

**Purkey Pray For Relief**

50. Because of the egregious and outrage retaliatory conduct Purkey has and continues to suffer because of the defendants he request that the Court grant him compensatory damages in the amount of $10,000 against the defendants jointly and severly.

51. Further' based on the egregious and grave mental anguish suffered

by Purkey by the retaliatory actions of the defendants of an ongoing nature he asked the court to award him punitive damages against the defendants in the amount of $10,000 jointly and severly.

## COUNT   FIVE

### IN VIOLATION OF THE EIGHTH AMENDMENT PURKE, BARRETT, AND MITCHELL HAVE BEEN AND CONTINUE TO BE SUBJECT TO "WANTON AND UNNECESSARY" INFLICTION OF PAIN BY THE DEFENDANTS TOTALLY WITHOUT ANY PENOLOGICAL JUSTIFICATION

The defendants Watts, Nalley, Veach, White, Ryherd and Smith have and continue to subject Purkey, Barrett and Mitchell to "Wanton and Unnecessary" infliction of pain without penological justification through their deliberate indifference and refractory attitudes to the excessive, incessant and torurous noise that the plaintiffs' are being subject to through their conditions of confinement in violation of the Eighth Amendment to the United States Constitution.

### Facts Germane To Purkey, Barrett And Mitchell

52.   The Special Housing Building, which houses the Special Security Unit is a four story building. The first two floors houses both disciplinary and administrative general population prisoners and is called the Special Housing Unit, hereinafter referred to simply as "SHU". The top two floors house's SCU. The Special Housing Building has only been open less than two years and is experiencing myriad of mainteance problems. The building it referred to by both staff and inmates alike as the "Lowest Bid", which reference is pretty self evident. Because of the flimsy structure of the building noise of the most low level carries throughout the entire building. Shortly after death row prisoners were transferred to the new facility acoustic paneling was installed down the center of the ranges to militate the enormous echoing throughout the

33.

building.  Defendant Ryherd claims that the culprit of the noise problem is made by 'fellow inmates communicating' down the ranges.  See Appendix (Q). This was not true at all which will become clear through the subsequent para- graphs.  The installment of the handful of acoustic panels only installed down the middle of the ranges was the old 'bandaide on the cancer' type of cure.  The panels did bring a modicum of relief to the anguish caused by the excruciating and torurous noise.  Keeping in mind that an inmate hollowing from the first floor through the vent can be heard on the top of the fourth floor without any resistance.  The noise complained of here is the result of inmates either in the SHU and/or from the SCU/Step Down Inmates who occupy three of the upper fourth floor ranges.

53.    At the root of the problem is the flimsy structure of the Special Housing Unit itself, coupled with the defendants deliberate indifference being shown to taking any corrective actions what-so-ever to the inmates causing the noise itself.  Each cell is funished with a shower and toiler sink combo.  Both are made of stainless steel.  The shower sits adjacent in the back of the cell to the cell's bunk.  The shower is enclosed by large sheets of stainless steel sheets approximately 8 x 3 feet.  Generally this is the instument most utilized by the disruptive inmates to cause the incesszant and torturous noise.  When the inmate starts beating on the side of the shower enclosure it literally reverberates and echoes throughout the building, but of course more so in close proximity with the pounding itself.  The reverberation can be felt through both the concrete walls and floor which seem to literally be conduit for carrying these sound waves.  Living in a cell in close proximity of the pounding is similar with being in a fifty-five gallon drum and having someone pound on the outside of it with some instument.  You cannot escape it and generally it must

34.

endured hour upon hour, upon hour for sometimes 24, 36 and 48 hours at a time. The reverberation from the pounding when lying in the cell's bunk is like lying down next to railroad tracks while a train is passing by, literally vibrating throughout a person's body and head.

54.    The noise complained of is far - far beyond simply the normal noises of prison life which the defendants have as well come to concede.  The issue is a combination of factors as enunicated above, but the main issue is the defendant deliberate and flagrant indifference to take any measure of corrective actions.

**Facts Germane To Purkey**

55.    After immediately after being transferred to the new facility Purkey voiced complaints to defendant Ryherd and White about the incessant and torurous noise enamating from the SHU.  Both defendants, contrary to Case Worker Ryherd's initial response to Purkey's BP-8 conceded that there different was a noise problem far beyond the claimed 'chatty inmates' being the culprit.  Id./BP-8 Response.  The warden claimed tht installing acoustic paneling would alleviate the problem.  Id./Warden's Response.  What the warden did not clarify is that the acoustic panels were only placed down the middle of the ranges, not in the actual cell's where the actual victims' of the excruciating noise dwell.  Basically all the defendants contend that the problem is exactly as described herein, and go onto postulate that the conditions are inescapable, thereby no affirmative actions on their part is required to address it.

56.    When Purkey complained to defendant Ryherd and White about being keep up for hours and hours by the excruciating pound that is causing him acute stress and anxiety, excruciating headackes and racing heart they told him that he needed to start pounding on his shower and keeping that guy up as well

35.

down stairs.  You mean you want me to start pounding and cause everyone else around me anxiety and stress and extreme mental and physical anguish because of some idiot down stairs.  They both agreed that that might be one solution. Purkey asked them why the officers' in the SHU could not take come measure of corrective actions, to at minimum tell the pounding inmate to quite.  And then if he refused to take whatever disciplinary actions necessary to gain compliance. That will not do any good they both stated.

57.  During one particular episode of being subject to excruciating pounding from below for hours and hours on end where Purkey could not sleep for almost 48 hours he was taken to the infirmary suffering acute anxiety, heart palpit- ation and pounding headacke.  See Appendix (R).  The following day Purkey was again taken to the infirmary suffering acute anxiety, heart palpitation and enormous pounding headackes.  See Appendix (S).  Purkey continued to ardently complain of the torurous noise he was being subject to. Officer Anders who works in both the SHU and SCU told Purkey that he knew exactly which inmate was doing the pounding below him, but that there was not anything that they could do about it.  "You mean that you can have someone in the SHU asked the guy to stop pounding," Purkey asked him.  "It would not do any good anyway," Anders said.  A few late Purkey complained to OCI Daughtery about the incessant pounding and the acute anxiety and extreme headackes he was suffering.  'This officer told Purkey that, "you simply need to man-up and deal with it, because we are not going to do anything about it."  Another officer told Purkey that, "If you push your emergency button again we are giving you a disciplinary report for disruptive behavior."

58.  The warden's response to Purkey administrative efforts in redress of this issue was characterized by the warden as being one prevalent to the facility

36.

at large, not particular to either the SHU and/or the SCU. This blatantly misrepresents the issue. Further' defendant Veach states that applicable SHU and SCU personnel have been informed to take necessary steps to address this issue, although what action is to be taken is at their discretion. Purkey spoke with Warden Veach shortly after his two infirmary visits anent the acute anxiety and racing heart with chest pains resulting from the torurous pounding. He asked the defendant what exactly was told by him to his staff to take as corrective action concerning the ongoing problem. He said that his staff will take whatever actions they deem necessary. When Purkey persisted in his quest for the warden to identify what actions that might be deemed necessary or approriate, the wardn became iritate telling Purkey that if he did not like his answer, then file on him.

59.    During this same period Purkey as well spoke with the Facility Captain Smith concerning the noise issue enamating from the SHU and the Inmates being held in the SCU under the Step Down Program. He told Purkey basically the same the thing that the warden did that no directives or actually promulgation has been issued as to what action if any to take concerning the disruptive inmates. So nothing what-so-ever is going to be done about the incessant and torurous noise that is literally causing death row prisoners dire anxiety and stress problems, as well as physical ones as well. "That is correct," defendant said, "you guys just need to man-up and deal with it."

60.    Purkey continues to suffer sleep deprivation due to the excruciating pounding, whereas he generally has to sleep on his cell floor, getting as close to the front of his cell as he possibly can to militate the virbration and nooise enamating from below him, directly or in close proximity.

**Facts Germane To Mitchell**

37.

61.    On numerous occasions Mitchell has complained to the defendants about the incessant, unrelentless and excruciating pounding enamating from both the SHU, as well as from the Step Down Inmates held above him on upper B/Range.  The pounding on the showers which reverbrates through Mitchell's cell, walls and floor last anywhere from a few hours to days on end, causing Mitchell sleep deprivation, acute anxiety and excruciating headackes.  The noise, the vibrations cause from the sheets of stainless steel is torturous, whereas Mitchell is trapped to deal with it.

62.    Within weeks of arriving at the new facility Mitchell spoke with Case Worker Ryherd about the pounding and incessant noise.  Ryherd, along with defendant White told Mitchell that there really was not anything that they could do about it.  "Perhaps the SHU staff could tell the disruptive inmates to stop the pounding, as it is obvious that they can easily see who is causing the problems when walking by their cells," Mitchell suggested to the defendants.  Defendant White suggested that Mitchell start pounding himself and give the guy a dose of his only medicine.  Mitchell told the defendant that he could not believe he was advising him to be disruptive himself in effort to quail the situation, which in reality is only aggravating.  "I guess I need to file a grievance in redress of this relentless and excruciating noise," Mitchell told Ryherd and White.  "That really is not going to matter much either, as grievances have already been filed concerning this issue and those haven't resulted in any solutions," Ryherd told Mitchell.  So what you are telling me then Mitchell told the defendants is that no one is going to do anything to address the problem.  Both defendants merely said that there really isn't anything that we can do about it.

63.    On March 13th, 2007 around 9 p.m. an inmate over James Roane's cell

and in the immediate proximity of Mitchell's cell on Lower B/Range started pounding on his shower stall and continued to do so continuously for twenty-four hours or more. Around midnight on the 13th Mitchell and Roane both stop the officer and explained the situation to him about the guy up stairs relentlessly pounding for hours on end dring them completely nuts. The asked the officer he could please ask the guy to stop the pounding. He basically told them that, "it will not do any good for me to ask him to stop pounding, because he is going to continue it anyway." The following day after being totally deprived of sleep both Mitchell and Roane stop Officer Anders and asked him if he would please tell the guy to stop pounding and let them go to sleep, this was around 9 a.m. Anders told them that he would go and ask Case Worker Ryherd what to do about the pounding, as he can easily hear it as well and actually feel the floor on the range vibrating. Returning from speaking with defendant Ryherd, Anders told them that Mr. Ryherd told him to tell them to "wrtie the Regional Director." Both roane and Mitchell were stressed to the max, nerves on end, suffering acute anxiety and excruciating headackes as well.

64.    A short time after Anders brought Roane and Mitchell defendant Ryherd's response Case Manage Brain English brought legal mail for someone on the Range. Roane and Mitcehll stop him and explain the circumstances to him regarding the incessant and torurous pounding from above. "I can hear it," English told them, "But there really isn't anything that I can do about it," he replied. About an hour later Roane and Mitcehll both stop Warden Veach who was making admin-istrative rounds in the unit. They--both perspicuously explain the situation to him and clarified that they had been up since that time yesterday and that every staff member that they have requested help from has literally turned a blind eye and deaf ear to their plight. Further' the told the defendant that

39.

he has told other inmates through grievance responses that appropriate action has been ordered taken regarding this noise issues enamating from both the SHU and the Step Down prisoners, but whenever staff's attention is brought to the problems they adamantly refused to make so much as a token effort to address it. About this same time Roane and Mitchell were speaking with the Warden Captain Smith arrived on the range as well and was present for the conversation. "What is it that you want me to do about the situation," the warden asked Roane. "Perhaps you could move the guy, or at least have your staff tell him to stop the pounding or he is going to be subject to disciplinarya ction," Roane told the warden. In fact while Mitchell and Roane were speaking with the two defendants the problem was continuing, although not of the magnitude that Mitchell and Roane were being subject to it, but the warden and captain both could hear the pounding and enormous vibration being caused from it on the range. "So you want me to move the guy so someone else has to deal with the problem, is that what you are telling me," the warden told Roane. "You have answered in grievances that you have advised your staff to take appropriate action, at their discretion, and yet' every officer I have spoke with or for that matter every other inmate alike that has sought diferent officer's aid to deal with this problem has plainly stated that no one has told them to take any action what-so-ever anent this noise issue and that they are not doing to take any action what-so-ever," Roane told the warden and captain. At this time the warden told James Roane to step aside from his door so he could see into his cell. When Roane did this, he told the warden, "No you are going to see if their is anything wrong with my cell that you can harass me for because I am bringing this problem to your attention." The warden and captain walked off at this time.

40.

65.    Sometime later Roane and Mitchell heard the disruptive Step Down Inmate being moved up above them to another cell down toward the end of the range.  Officer Daughtery told them awhile later that the warden had actually went up stairsj himself accompanied by Captain Smith and started yelling that "this freaking god damn noise and pounding is going to stop, and I mean now." He was directly in front of the cell of the inmate who was actually sitting inside his shower pounding at that time, so there was absolutely no doubt what-so-ever who was the culprit of the problem.  The only problem is that this was just putting another bandaide on the cancer, as the problems continue without redress.

66.    The following day defendant Ryherd advised both Mitchell and Roane that "we" have acouple of different plans to address this incessant pounding by those inmates above you guys.  Mitchell asked Mr. Ryherd, "you mean that the warden or Captain Smith has issued written promulgation specifically ident- ifying what actions are to be taken regarding the disruptive inmates." "No, Nothing like that," Ryherd said, "but hopefully something is going to be done concerning the Step Down Inmates above you guys," Ryherd said.  When Roane asked Ryherd, "what about the SHU disruptive inmates who are causing just as much if not more of a problem than the Step Down Prisoners are." "I don't know, maybe the warden and Captain Smith will come up with a tentative solution concerning that issue later on," the defendant said.

**Facts Germane To Barrett**

67.    In March 2006 after arriving at USP Terre Haute and being placed on SCU Barrett complained to Case Worker Ryherd about the incessant noise, and pounding that he had been subject to for days on end from someone inmate in the SHU.  Mr. Ryherd told Barrett that he was aware of the problems being

41.

caused by the disruptive prisoners in the SHU, but there is not anything that he can do about it, because he has absolutely no authority in the SHU. "You mean that certain SHU inmates are allowed to continuously be disruptive, causing excruciating noise, pounding and disruptions without any officer in the SHU taking any form of redress," Barrett Asked the defendant. "If the problem does not reach a point of being a disrutpion to staff's ability to do their job then it is not considered worthy of being redressed," Ryherd told Barrett. "Go ahead and bring me a BP-8," Barrett the defendant. "It isn't going to do any good to file a grievance concerning this issue, as other griev- ances have already been filed and have failed to bring any resolve to the issue," Ryherd told Barrett.

68.    In the past year Barrett has been subject numerous times to being subject to the pounding and torurous noise enamating from both the SHU and certain inmates in the SCU as well. He has been subject to literally days of sleep deprivation, acute anxiety and excruciating tension and headackes. He has sought help from both the Warden, Captain Smith, White and Ryherd in redress of being subject to these conditions. In fact on numerous occasions Barrett has been subject to not only the incessant pounding, but to mutually aggravating conditions of confinement by SHU inamtes causing the fire alarms to go off for hours and hours on end. The screeching and shrill noise is unbelievable, which is accompanied by blinding lights setting and positioned throughout the range. The staff are all provided with head gear to protect themselves from these unbelievable screeching and shrill blasting sounds, Barrett and all other similar situated prisoners are forced to simply endure these tortures the best they can. The mentality by staff concerning these

42.

issues of excruciating noises being suffered by death row inmates is, "they need to man-up and deal with it." Officer Anders has been candid enough with Barrett telling him that staff is well aware of who is doing the pounding, because they can easily witness them doing it walking by their cells', but they, "the officers', really do not care because it doesn't effect them, and no one has told any SHU personnel to take any action concerning this entrenched problem. Officer Daughtery has as well told Barrett that the noise and pound- ing simply something that we, "death row" have to deal with. In fact he has told other inmates which Barrett has witnessed that, " where do you think you are, "while pointing at the walls on the range to emphasize his point"." Barrett continues to suffer sleep deprivation, acute anxiety and termendous headackes because of the ongoing and incessant pounding from the SHU and particular SCU inmates, i.e. Step Down Program Inmates.

### Purkey's, Barrett's and Mitchell's Pray For Relief

69.    Because of the irreparable and ongoing harm being suffered by the plaintiff's because of the defendants obsurate ossify and obstinacy shown to the constitutionally proscribed conditions of their confinement they request that the Court grant them compensatory damages in the amount of $75,000 against the defendants jointly and severly.

70.    Further the plaintiffs' request that the Court grant them punitive damages in light of the defendants' flagrant deliberate indifference shown to the constitutionally proscribed conditions of their confinement in the amount of $25,000 jointly and severly.

### COUNT    SIX

### DEPRIVATION OF PROPERTY AND BEING SUBJECT TO SANCTIONS OF

43.

## PUNITIVE NATURE WITHOUT DUE PROCESS OF LAW

Defendants Watts, Nalley, Veach, White and Ryherd have and continue to deprive Purkey, Barrett and Mitchell of their property, i.e. funds depositied in their institutional accounts, and subject them to a myriad of sanctions of punitive nature without due process of law in violation of the Fifth Amendment to the United States Constitution.

**Facts Germane to all the Plaintiffs'**

71.    All prisoners sentenced with legal financial obligation, fines, special fees, cost and etcetra, including death row prisoners, will be required to develop pursuant to Program Statement #5380.07, Financial Responsibility Program, Inmates ("IFRP")(A copy attached hereto for the Court's convenience), a finanical payment plan to satisfy those financial obligations.  The applicable BOP authority establishes mandatory criteria for assessing an inmate's finanical payment plan, limiting official discretion in the process.

72.    The edification of the governing authority has concatenating components instructing pellucidly simplistic steps to be taken in determining and assessing and inmates finanical payment plan.  Those are in relevant part:

"At each program review, when reviewing the inmate's finanical plan, the Unit Team must:

1.    Determine the total funds deposited into the inmate's trust fund account for the previous six months;

2.    Substract the IFRAP payments made by the inmate during the previous six months; and

3.    Substract $450 (i.e., $75 x 6 months, ITS exclusion).

See Appendix (T) p.(1) thr (3).

73.    Any money remaining after the above computation's may be considered for IFRP payments, regardless of whether the money is in the inmate's trust fund

44.

or phone credit account. The Unit Team has discretion to consider all monies above that computation to adjust the inmate's payment plan. Id.

74. The remaining money after the three step computation may be used in determining and assessing an inmate's IFRP payment through the appropriate scale fixing such through the designated level on the chart. Id. p.(2). That scale called 'Minimum Acceptable Paymeny Plan For Non-unicor Inmates Unless Justification For A Lesser Plan Is Documented In The Central File:' establishes an inmates IFRP payment through fixed variant amounts up and down the scale that alleviates official discretion in this assessment and sets a different amount of payment to be determined after the three (3) step computation is completed. The unit team has the discretion **to determine all monis above that computation** to adjust the inmate's IFRP payment plan. Simply meaning that their discretion is authorized after the computation is completed and the amount remaining then is used in combination with the established scale to determine the inamte's new payment plan. The process could not be simplier, although the defenants content that they are not bound by the authority of that policy for determining and assessing death row prisoners' IFRP payment plans, and in fact asserts perspicuously that they have absolute and unfettered discretion in this matter, and if the inmate does not comply with the unit team's arbitrary computation and assessment of their IFRP payment plan then they are subject to a myriad of sanctions of punitive nature.

75. The myriad of sanctions of punitive nature which are imposed when an inmate does not satisfy their assessed IFRP payment plan by the unit team is set through 28 CFR 545.11. (A copy of that policy is hereto attached for the convenience of the Court). This policy although applicable to death row prisoners is not delineate other sanctions specifically assessed to death row

45.

prisoners, as the defendants applied other sanctions of punitive specifically based on death row inmates unique setting. Those sanctions have not been authorized through applicable BOP channels of approval.

76. The deprivations complained of, the misrepresentations and creations of a sub rosa policies being applied to death row inmates to excerpt funds from their trust fund accounts in payment toward legal financial obligations is not the result of a random and unauthorized taking and/or act.

**Facts Germane To Purkey**

77. After being subject to sanctions twice for his failure to make assessed IFRP payments by the unit team Purkey sought resort through applicable administrative procedures in redress of both the unauthorized actions and in redress of being subject to similar unauthorized punitive actions through the unit team's fraudulent computations. See Appendix (U). In October 2004 defendant Ryherd and White placed Purkey in IFRP Refusal Status and subject him to the full speetrum of sanctions authorized and other wise through the applicable policy. Both defendants refused to both Purkey with the computation they used in assessing his supposed IFRP payment based on his previous six month deposits to his account. They both advised Purkey that they had absolute authority in making this determination and that is simply how it is. Id. (BP/8/Ryherd's Reponse).

78. This punitive action taken against Purkey by the defendants' based supposedly on his refusal to satisfy the unit team's assessment of his IFRP payment plan was in close proximity with Purkey seeking redress on behalf of another death prisoner who had been subject to an assult by staff. Purkey sought redress on that prisoner's behalf, because that prisoner feared further retaliation if he pressed the issue himself through administrative processes. See Appendix (V).

46.

79.    Almost a year later the defendants again placed Purkey in IFRP Refusal Status, and again subject him to the full spectrum of sanctions and others designated under the applicable policy.   Purkey clearly had not received sufficient funds in the previous six months to warrant any payment toward his financial obligations.   This fact would become perspicuously clear when a short time later Purkey was placed in temporary exempt status.   The placement of Purkey in IFRP refusal status and subjecting him to the spectrum of sanctions the defendants did again was in close proximity with Purkery's resort to the administrative remedies anent the taking of his law library clerk position. Id.

80.    Here again the defendants White and Ryherd claimed they had absolute discretion in making this assessment and placing Purkey in IFRP refusal status. They again, as well, refuse to provide the computation/math used in making their assessment of Purkey IFRP payment.   See Appendix (V).   Here' defendant White clarifies that the unit team has absolute discretion in making this assessment.   Although Mr. White does not address why Purkey was again placed in exempt status shortly after filing the administrative remedy, which the Regional Director concurred with.   Id. But here again that defendant as well refused to provide the computation/math which was utilized in making Purkey's financial assessment payment plan.

81.    Defendant Veach concurred with defendant White's and Ryherd's assessment of Purkey financial payment plan, and he enunicate the mandatory three step process that must be adhered with in making that determination.   Although' defendant Veach did not provide the actually computation used in assessing Purkey's financial obligation payment which certainly would of either disputed or supported Purkey's allegations of the two defendants fraudulent determination of his

47.

IFRP payment obligation and for placing him in IFRP refusal resulting in various sanctions being imposed.

82.   The assessment by the defendants of Purkey's IFRP payment(s) were the results of a de facto policy firmly in place, which in reality is a sub rosa policy geared toward death row prisoners to extract money to fully cover their legal obligations before they are put to death.   In other words the absolute discretion claim by the defendants and totally supported through all levels of the administrative channels to the National Appeals Officer, i.e. defendant Watts is the de facto policy in play and utilized toward death row prisoners. Because Purkey refused to satisfy his financial assessment payment by the defendants without being provided the applicable computation/math that was utilized in that assessment the defendant subject him to various sanctions in punishment. As well' the defendants have used the de facto policy/sub rosa policy as a tool for retaliationa gainst Purkey for him exercising administrative processes.

**Facts Germane To Barrett**

83.   In September/2006 Barrett was placed on IFRP refusal status after defendants Ryherd and White determined at his six month review that his IFRP payment should be set at $60 a quarter.  See Appendix (W)/BP-8).  When Barrett asked the defendants to share their computation/math with him predicating their assessment of his IFRP payment they refused.  Both defendants maintained to Barrett that basically they have unfettered discretion in making this assessment, and if he refused to sign the contract that he would be subject to punitive sanctions.  Id.  Barrett clearly told the defendants that he was not refusing to comply with the applicable policy governing assessment of his financial obligation payment, but he did not believe that they could arbitrarily assess his IFRP payment without complying with the promulgated computation in that process.

Barrett went on to stress to both defendants that all he was asking was to be shown the math they utilized in making his $60 assessment per quarter. The defendants' construed this legitimate request as one of refusal.

84.   Defendant Veach in review of Barrett's claim of the unit team's arbitrary placement of him in IFRP refusal status and their assessment of his IFRP payment responded, inter alia, that, "[H]owever, based on the above formula from Program Statement 5380.07, Unit staff could consider that you be required to pay $365.00 within the next six months." Id.  This is certainly hard to square, not only under the applicable authority for determining and assessing an inmate's IFRP payment, but in the very fact that Barrett's financial obligation in total is only $300.00.  No where in the regulation quoted by defendant Veach would it allow the unitl to require anyone receiving $815 for a six month period to pay $365.  Yet' in conclusion the warden states, inter alia, that unit staff will reconsider your financial situation and will offer you the opportunity to sign another contract that considers all of the money that you have received minus IFRP payments and $450 for phone credits.  This was suppose to be the formula the unit used in the initial assessment, contrary to their absolute discretion claim.  Barrett remained subject to punitive sanctions contrary to the warden's reassessment contentions.

85.   Defendant Nalley as well refused to provide the computation/math used by the unit team, warden or himself in assessing Barrett's IFRP payment and in support of the ongong sanctions he was being subject to.  But' this defendant contends in a dubious fashion that the unit retains ultimate disrection in both determining and assessing an inmate's IFRP payment, as well as their ability to pay it.  On the other hand the defendant finds as well that placement of Barrett now in temporay exempt status was justified as well.  Mr. Nalley goes

49.

on to hold that Barrett has not supported his claim of being arbitrarily subject to punitive sanctions and/or having his IFRP payment assessed by the unit team. Although Barrett's grievance were repleted with evidence of just such arbitrary assessment and being subject to punitive actions for his failure to satisfy this fraudulent assessment. Id. Barrett showed the math, and that is why he was ultimately placed in temporary exempt status, whereas the defendants have played ostracism to coming forward with the computation/math they used in making Barrett's IFRP assessment.

86.    In March/2007 the Unit Team once again considered and determine that Barrett's IFRP payment should be $25 per quarter. Further' they told Barrett again that this determination was solely theirs and that the policy in this case did not matter. Although the defendants make reference to the three step computation and the remaining funds being used to determine hi assessment fees through the scale - they did not do this. They told Barrett if he did not sign the contract that he would again be subject to punitive sanctions as he was last time. To spare himself being subject to these punitive actions Barrett signed the contract agreeing to pay the $25 assessment payment. Barrett did ask the defendants if they would write down the computation/math they used in making this assessment and the both adamantly refused. They refused to do so.

87.    Before leaving the Unit Team Office Barrett brought the Unit Team's attention, Ryherd and White to the IFRP payment assessment scale chart on the back of the outter office wall. He then asked both defendants' why did was assessed to pay $25 per quarter, because he had received less than the $450 exclusion ITS exemptions for the past six months, and based on that fact and the assessment scale he should be placed in exemption status, he told the defendants. "No' that is not correct, that chart/scale, defendant White said, "is

50.

not only extremely too liberal, but is only a reference scale, not mandatory for us to use when determining your IFRP payment." Defendant White went to content that, "even if we do chose to go by the scale, the scale itself includes the $450 deduction or ITS exclusion for the previous six months." Barrett thought that such contention was extremely odd and asked the defendants, "if that is true that the scale has the ITS $450 exclusion figured into it, then what about any previous six months payments an inmate may of made toward their legal finanical obligations," Barrett asked the defendants.Clearly becoming irritated at this line of questioning by Barrett, defendant White mordantly told him that, "if we want we can go ahead and divide any money you have received in the past six months, divide that in half and that will be your assessed IFRP payment, so keep that in mind when you are squabbling about our original assessment," Mr. White advised Barrett. Barrett agreed to sign the contract to pay the assessed IFRP payment for the previous six month, but did so under coercion and threat of suffering various snactions of punitive which he had been subject to in the past when he refused to pay the erroneous assessed IFRP payment.

**Fact Germane To Mitchell**

88. On several different occasions the defendants, Ryherd and White have subject Mitchell to sanction of punitive nature for supposedly his refusal or failure to comply with their IFRP payment assessments. These assessments have all been based on misrepresentation of the applicable policies and procedures governing determining a prisoner's IFRP payment plan. See Appendix (X). In July/2006 Mitchell sought redress for the ongoing erroneous assessments of his IFRP payments, as well as for the coercion and threats used to force him to sign contracts and comply with the erroneous assessments. Id. He availed him-

89.    Through applicable policy governing IFRP assessment payment plan Mitchell should of been placed on exempt status furing his April/2005 review. After paying a $105 the prevous six months, and receiving $749.18 for the previous six month period and then deducting the $450 ITS/Exclusion in combination with the previous $105 payments made bringing the sum for deduction to $555, and taking that away from the ending balance of $749.18 the amount remaining is $299.18.  According to the authority the next step in the computation or for determining an inmate's IFRP payment is to go to the Minimum Acceptable Payment Scale.  Id./BP-8/Special Exhibit (A).  Based on that scale Mitchell should have been placed in Temporary Exempt Status.  He signed the contract as drafted by the defendants, paid the assessment payment, but then refused to pay the additional assessed payment determined by defendant Ryherd just a few days later.  Id./BP-8.  Mitchell asked the defendant to please provide the computation/math for making this ongoing deterimination of his IFRP payments, after just advising him that he would only be required to make a one time $25 assessed payment.  The defendant told Mitchell that he can adjust his payment, increase or decrease it as time goes by. "He has absolute discretion in these matters," he told Mitchell.

90.    None of the defendants dispute Mitchell's math in calculating his conclusion that he supposedly should of been placed in IFRP Temporary Exemption Status, nor do they provide any different assessment, that is beyond the bland conclusion that he should be subject to IFRP refusal status which he was placed in on March 6th, 2006.  Defendant Ryherd clarified that Mitchell would remain subject to sanctions, including placement in Phase I status until he agreed to comply witht he Unit Team's assessment.  Because of the continuing sanctions

52.

Mitchell was being subject to he agreed to payment the erroneous assessment on April 19th, 2006.  Id./BP-9.

91.    The warden, and defendants Nalley and Watts all agreed with the Unit Team's assessment of Mitchell's IFRP payment requirements, that is without ever coming forward with the calculations they used in affirming this conclusion, nor did they dispute Mitchell's math.  What they did do is abritrarily find that Mitchell should be placed in Temporary Exemption Status based on funds received in May and June.  This certainly is mindboggling, because the applicable authority mandates assessment and calculation of an inmate's IFRP payment plan during re-view periods, taking into account the inmate's previous six months deposited funds, substracting $450 ITS exclusion and any funds pay toward legal obligations in the past six months.  Defendant Nalley in his response to Mitchell's argu-ments presented through the Regional Administrative Remedy Appeal provides a prolix inconsequential reasoning behind the reasoning the BOP is well within its' authority to collect legal financial obligations from BO prisoners.  And then the defendant makes further unproffered contentions that these determinations of IFRP payment plans are made on a case by case basis.  In conclusion Mr. Nalley claims that Mitchell has not submitted any evidence to support his claim that staff are not adhering with the IFRP policy.  Mr. Nalley does not dispute Mitchell's calculations asserting that the unit team erroneously assessed his IFRP payment plan, but just plays ostrcism to those calculations and makes the unproffered contention that the Unit Team and the Warden's decisions were supported. Yet' he supports the fact that the Unit Team placed Mitchell in temporary exempt status, and again without offering the calculation for supporting this deter-mination.  Mr. Nalley's blind acquiscence with the Unit Team's and Warden's actions anent assessing Mitchell's IFRP payment, and then ongoing assessment and

53.

is determined through his prolix and rambling response. One issue which Mr. Nalley is truly accurate on is, that death row's Unit Team, Defendants White and Ryherd does do a IFRP payment assessment on a case by case basis, although not in accord with appliable policy, but instead through using absolute discretion to set death row prisoners' financial asseement payments are whatever amount they determine necessary. Creating a sub rosa policy geared toward death row prisoners.

92.   Defendant Watts in response to Mitchell's Central Office Appeal held, inter alia, that"assessing restitution of $1,100.00 and $46,138.38 by the court, and that during the six month period in question for received $600; given this the uni team assessed $40.00 quarterly IFRP payments . . . you made two $25 payments and then failed to satisfy the remaining amount. Further staff determined that yuo lacked sufficient funds to to continue making IFRP payments and placed you in 'Exempt status'." Of course defenant Watts did not do or show what if any calculations he did in affirming the unit team's determination of Mitchell's IFRP payment assessment which is perspicuously obvious. Mr. Watts did not substract the $450 ITS exclusion, nor the $105 IFRP payments Mitchell made in the previous six months. If he had the fatal flaws of his superficial calculations would of been pellucid. Here again the defendant in conclusiorary fashion found that staff determinations regarding Mitchell's IFRP status have been consistent with Program Statement 5380.08. See Appendix (X).

93.   On March 21st., 2007 Mitchell went to a Team Review whereas it was determined that he had received $717 worth of deposits for the last six months. The defendants, Ryherd and White advised Mitchell that they determined that based on these deposits and under the applicable 'scale' that will be required to pay

54.

$50/quarter.  Mitchell told the defendants that he was not refusing to sign the contract, but that he is requesting that he be shown the calculations used in making this assessment.  Mr. White brought Mitchell's attention to the scale on the back in the Unit Team Outter Office area and told him based on the $717 deposits for the previous six months that he would be required to pay $50 quarterly.  (The Chart/Scale Mr. White referred Mitchell to is the same hereto attached as Appendix (T)(3)).  When Mitchell told the defendants that under the applicable scale he should either be placed in exempt status or required to pay $25 quarterly, because after deducting the ITS $450 exclusion from the $717 that left $217.  Mr. White said, "no' that is not correct because the $450 ITS exclusion is built into the scale itself."  "How could this possibly be," Mitchell said, "because if that was so then the scale would as well have to make adjustment for any previous IFRP payments made by an inmate the previous six months. "Look, White told Mitchell, "we are actually doing you a favor using this scale, which we are not required to do.  We could just divide all funds in half you received in the previous six months and then assess those in payment."  "So which way would you perfer it," White asked Mitchell, "to pay the assessed $50/quarterly or half of the $717 received in the previous six months?"  I would perfer to be shown the calculations you have used in determining my IFRP payment," Mitchell told the defendants, "and that way I know that the assessment is fair and authorized under the applicable BOP policy."  "In fact, Mitchell advised the defendants, "that in March of last year you assessed an IFRP payment against me in the amount of $40 quarterly where I have received $749.18 in deposits for the previous six months.  So it awful hard to understand how your calculations today could assess a greater IFRP payment against me  anent a lesser amount of deposits during that six month assessment period."  Defendant

55.

Ryherd told Mitchell, without addressing his question to the difference between the two IFRP determinations that, "either sign the contract or go back and pack your property, because you are moving back to phase I.  Mitchell refused to sign the contract and was moved back to phase I where he remains under various sanctions of punitive nature.

### Purkey's, Barrett's And Mitchell's Pray For Relief

94.    Because of the irreparable hard and ongoing harm being suffered by the plaintiff's because of the defendants sub rosa policy coercing them into either arbitrary complinace with IFRP payments or sanction of punitive nature being imposed in violation of the Fifth Amendment's Due Process and Equal Protection Clauses they request taht the Court grant them compensatory damages in the amount of $25,000 against the defendants jointly and severly.

95.    Further' the plaintiff's request that the Court grant them punitive damages in light of the defendant ossify and flagrant constitutional violations committed by the defendants in the amount of $25,000 jointly and severly.

### History  Of  Civil  Rights  Filings

### Civil Litigation History Germane To Purkey

1.    **Purkey v. Simmons,** (10th Cir. No. 01-3269)(D.C. No. 00-CV-3380-GTV) (E.D.Kan).  Sua Sponte Dismissed/Confirmed

2.    **Purkey v. McKune,** No. 00-CV-3218-GTV(E.D.Kan).  Voluntarily withdrew.

3.    **Purkey v. McKune,** No. 01-CV-3019-JML(E.D.Kan). Settlement accepted before going to trial.

4.    **Purkey v. Green,** 99-CV-3356 (E.D.Kan)/Dismissed/Appealed (10th Cir. No. 00-3218/affirmed in part and reversed in part/August 17th, 2001).

5.    **Purkey v. Green,** No. 01-3126-JAR (E.D.Kan) which was consolidated with Purkey v. Green No. 01-3019 on remand from Tenth Circuit.  After a protracted history were subject to summary judgment dismissal for Purkey's failure to adhere with the local rules of the court.  Appeal was taken and the Tenth Circuit affirmed for the same reasons summary judgment was granted to the

defendants.  A Writ of Certiorari was sought to the United States Supreme Court, Case No. 05A873, June 19th, 2006.  Review was denied.

6.    **Purkey v. CCA,** No. 03-CV-3157 (E.D.Kan).  Was dismissed for Purkey's refusal to voluntarily withdraw one count, Count VII from his petition after the court contemplated that Purkey failed to avail himself of all available administrative remedies after his transfer from CCA's Temporary Custody.  In light of the Supreme Court's holding in **Jones v. Walton,** Nos. 05-7058 and 05-7142, Janauary 22, 2007 this case should be reversed and remanded on appeal proceedings Case No.          (10th Cir.).

7.    Purkey has no strikes within the statutory provisions under the PLRA.

### Civil Litigation History Germane To Barrett

8.    **Barrett v. Barnes,** Case No. 05-CV-328-WH (E.D.Okla).  Was dismissed for Barrett's failure to properly describe exhaustion of administrative remedies, and affirmed on appeal, No. 06-7007 (10th Cir.).

9.    **Barrett v. Pierce,** Case No. 06-CV-00299-RAW-SPS (E.D.Okla).  This is the refiling of the foregoing dismissed Barrett v. Barnes where Barrett has properly described exhaustion of administrative remedies and the case is actively pending.

10.    **Barrett v. Philpot,** Case No. 05-CV-329-FHS-SPS (E.D.Okla).  This case is actively being prosecuted, waiting the filing and response of a Martinez Report.

### Civil Litigation History Germane To Mitchell

11.    Mitchell has no previous litigation history to report.

#### The Plaintiffs' Certification, Submission, and Jury Trial Request

**The undersigned,** Wesley I. Purkey, Kenneth E. Barrett and Lezmond C. Mitchell hereby request trial by jury, and do attest, under penalty of perjury, pursuant to 28 U.S.C. § 1746 that all claims and allegations made in the above and foregoing petition are true and correct to the best of their knowledge and beliefs.  They submit this Civil Rights Complaint this 16th day of April, 2007.

RESPECTFULLY SUBMITTED,

Wesley I. Purkey #14679-045

United States Penitentiary
P.O. Box 12015
Terre Haute, IN 47801

&

Kenneth E. Barrett #04342-063
United States Penitentiary
P.O. Box 12015
Terre Haute, IN 47801

&

Lezmond C. Mitchell #48685-008
United States Penitentiary
P.O. Box 12015
Terre Haute, IN 47801

**Plaintiffs' Pro Se**

### Partial    Certificate    Of    Service

The undersigned does attest that he will afford the defendants counsel when identified through the record with true and coorect copies of the plaintiffs' In Forma Pauperis applications and the applicable institutional accounting statements for the previous six months.

Wesley I. Purkey #14679-045
Plaintiff/ProSe

58.